CRAMER, Respondent, v. SPRINGFIELD TRACTION COMPANY, Appellant.

St. Louis Court of Appeals, May 2, 1905.

1. **PRACTICE: Pleading: Wilfulness and Negligence.** In an action for damages on account of personal injuries, an allegation of the petition that the act which caused the injury was "wilfully" and "negligently" done by the defendant, renders the petition bad because an act cannot be both careless and wilful.

2. ———: ———: ———: **Waiver.** But where in such case there was no evidence tending to prove wilfulness and the cause was treated by both parties on the theory that the issue was whether the injuries were caused by the negligence of the defendant, the defect in the petition was thereby waived.

3. **CARRIERS OF PASSENGERS: Passenger Alighting: Knowledge of Motorman: Jury Question.** In an action for personal injuries received by plaintiff while alighting from a street car by the sudden starting of the car before she had time to alight, the evidence showed that the car stopped at a usual stopping place for persons to get on and off, that the plaintiff requested and received from the motorman a transfer check to another line, that the motorman was in charge of the car, there being no conductor, and the evidence was conflicting as to whether the plaintiff alighted before or after the car started. *Held*, that the duty of the defendant as a carrier of passengers was not discharged by merely waiting a sufficient length of time for the passenger to get off, but the motorman was bound to exercise the utmost care in discharging her; if the motorman knew, or by the exercise of due care could have known, that the plaintiff was leaving the car, he was negligent in starting the car before she safely alighted, and the question as to whether he was negligent was properly submitted to the jury.

4. ——: ——: ——: **Instruction.** An instruction in such case which authorized a recovery, ignoring the question of the motorman's knowledge, or opportunity to know, that the plaintiff was alighting, when he started the car and thereby caused her injuries, was erroneous requiring a reversal.

5. ——: ——. The motorman in such case was not, in the absence of notice by the passenger of an intention to get off, negligent as a matter of law in failing to observe that the plaintiff was alighting, but it was his duty to watch the rear platform to see if any passengers were alighting, and whether he was guilty of negligence in failing to do so, was a question for the jury.

Appeal from Greene Circuit Court.—*Hon. James T. Neville,* Judge.

REVERSED AND REMANDED.

*Delaney & Delaney* for appellant.

(1) The petition charges that the motorman negligently and wilfully started the car with a sudden jerk while plaintiff was in the act of alighting. To use the language of Judge Sherwood, "The petition on its face is a *felo de se.*" Raming v. Railway, 157 Mo. 507, 57 S. W. 268. (2) If the term wilfully is rejected, then the

liability of defendant can be predicated only upon one of two theories: First, that the car stopped either at a regular stopping place and did not wait a reasonable time to permit all passengers for said point to alight; or, secondly, that defendant's servants knew plaintiff was in the act of alighting, for, after waiting a reasonable time, no liability can then arise except on actual knowledge that a passenger is in the act of alighting. McDonald v. Cable Co., 32 Mo. App. 70; Cullar v. Railway, 84 Mo. App. 340; Strauss v. Railroad, 75 Mo. 185; Hurt v. Railway, 94 Mo. 256, 7 S. W. 1; Ridenhour v. Railway, 102 Mo. 270, 13 S. W. 889, 14 S. W. 760; Yarnell v. Railway, 113 Mo. 578, 21 S. W. 1; Jackson v. Railway, 118 Mo. 199, 24 S. W. 192; Cobb v. Railway, 149 Mo. 135, 50 S. W. 310; Grace v. Railway, 156 Mo. 295, 56 S. W. 1121.

*O. T. Hamlin* for respondent.

(1) Appellant makes the point in his brief that the petition charged that the conduct of the defendant was both negligent and willful, consequently repugnant and contradictory in terms. I desire to suggest that there was no evidence introduced or sought to be introduced excepting upon the theory that the conduct of the defendant's motorman was negligent. The case was tried upon that theory solely. No general demurrer was filed to the petition, but both parties proceeded upon the theory of negligence entirely. In other words, the word "willful" in the petition seems to have been treated by both plaintiff and defendant as surplusage. "Under the reformed procedure the plaintiff is never to be deprived of his verdict and judgment merely because he has alleged too much. The surplusage may be rejected, and if his petition is still good, under the doctrine of aider by verdict he may keep his judgment, no other error appearing." Radcliffe v. Railroad, 90 Mo. 127, 2 S. W. 277; Gannon v. Gas. Co., 145 Mo. 511, 46 S. W. 968, 47 S. W. 907; Knox Co. v. Goggin, 105 Mo.

182, 16 S. W. 684; Floyd v. Gilkey, 29 Mo. App. 211; Koopman v. Cahoon, 47 Mo. App. 357. (2) In an action based upon the facts showing negligence, if sufficient facts can be gathered from the averments to make out a case, however imperfectly stated, evidence is properly admitted in proof of the averments of the petition. Delaney v. Bowman, 82 Mo. App. 252.

STATEMENT.

After alleging that defendant is a corporation and owns and operates a system of street railways in the city of Springfield, Missouri, the petition states:

"That on the twenty-second day of March, 1902, at the intersection of Center street and Benton avenue, in said city, this plaintiff boarded one of defendant's said cars, and became a passenger on same, paying her necessary fare and remained on said car until she reached the intersection of Commercial street and Benton avenue, at which place she requested the motorman, who was in charge of the car, to furnish her with a transfer ticket over the Springfield avenue line, the corner of Benton avenue and Commercial street being the junction for the Springfield avenue line; that in compliance with her request the said motorman did furnish her with a transfer ticket for said Springfield avenue car, and that she at once proceeded to get off of said car, and in doing so walked from where the motorman was standing in the front end of same to the rear, and that as she was just alighting from said car, the motorman negligently, carelessly and willfully turned the current of electricity, thereby causing said car to jerk instantly and start at a rapid rate of speed. Said jerk was so sudden that it caused plaintiff to fall from the step of said car on to the brick pavement, injuring her as follows: Dislocating her right shoulder and breaking her shoulder cap, and on account of said in-

jury she has suffered intense pain from said time until the present, and that said injuries are permanent. Plaintiff says that by reason of the injuries as aforesaid caused by the negligence and carelessness of the servant or employee of the defendant she has been damaged in the sum of $5,000, for which she asks judgment."

The petition was not demurred to nor was a motion filed to make it more defienite or specific or to strike out any part of it; without taking any exception to the petition, defendant filed its answer, containing a general denial and a plea of contributory negligence.

Plaintiff's evidence tends to show that on March 22, 1902, she boarded a Benton avenue car and rode to the intersection of Benton avenue and Commercial street, where the car was stopped opposite Reed's drugstore and just past the foot crossing over Commercial street.

Plaintiff testified that when the car stopped at Commercial street, she walked to the front platform and held up her nickle and the motorman made a motion to her to drop it in the box which she did and then asked for a transfer for the Springfield avenue line. Plaintiff stated: "He was writing when I asked for the transfer, and he didn't pay any attention just then. He waited until he was done writing, and he said to me, 'What did you say?' I says, 'I want a transfer to Springfield avenue,' and he gave me a transfer, and I turned right around and picked up a little bundle that I had, and I just touched my limb on the seat, and I went back that way, and I made a spring and I came right up, and I walked out as straight as I could go, and it didn't exceed one minute from the time I left the motorman until I was on the street with a broken shoulder." Plaintiff also testified that she had the transfer ticket and a bundle in her right hand and had hold of the hand rail with the left, with one foot on the lower step, and was in the act of reaching the other to the ground, when the car was suddenly started, throwing her off. Plaintiff further tes-

tified that she was sixty-seven years old and was in good health when she was injured, but had "busted veins" in one of her lower limbs and when riding on a car she had weakness in her limbs and could not walk in a car while it was in motion, but that the weakness disappeared as soon as she was up and off the car. Plaintiff said that she did not hear the gong of the car sounded. Plaintiff's evidence and that of her attending physicians shows that her right arm was broken at or near the shoulder, that she suffered a great deal of pain and that her injury is a permanent one.

The Springfield avenue line runs over Commercial street at the junction of Benton avenue and Commercial street and for several blocks east, and passengers with transfers from the car on which plaintiff was traveling could board a Springfield avenue car at the junction or at several other places east thereof on Commercial street. The plaintiff did not notify the motorman that she wanted to get off at the junction to take a Springfield avenue car and there is no evidence to show that the motorman knew that she intended to get off at said point, and nothing in the evidence from which notice may be inferred, unless it can be inferred from the fact that plaintiff procured the transfer ticket at the junction and that passengers get on and off the cars at that point. The cars of defendant are run without conductors. Fares are paid by the passengers dropping their nickels in a box put up in the car for that purpose. The evidence shows that a mirror is so placed on the front platform as to enable the motorman by looking into it to see the inside of his car from one end to the other. The motorman in charge of the car testified that he looked back around the car to see if anyone was getting on or off and seeing no one, sounded the gong and then started his car. He did not remember seeing the plaintiff on the day of the accident on or off the car, or giving her a transfer, and did not know that she was hurt until about three hours after the accident. Plaintiff

testified that when she got on the platform, she saw a car coming up which she thought might be a Springfield avenue car, and there is ground for the inference that she was in a hurry to get off to catch that car, but she denied that the sight of the car caused her to hurry or caused her any anxiety.

George Franks, a motorman on another car, testified that he came up with his car, behind the one plaintiff was on and within ten feet of it, and stopped and saw the accident, in regard to which he testified as follows:

"Q. Just tell the jury what you saw and how it occurred? A. The first I saw of it the lady stepped up to the front end of the car and was talking to the motorman. I don't know whether she had asked him for the transfer or not, but she turned around and walked back about middle ways of the car and sat down.

"Q. What was that car doing that she was on at that time? A. Standing still.

"Q. What were you doing? A. I was standing still.

"Q. On the opposite side of the street? A. No, sir; right behind him, waiting for him to get out of my way.

"Q. How far behind him? A. Not ten feet.

"Q. You say you saw her get a transfer and go back and sit down? A. I don't know whether she got a transfer or not. She stepped to the front end of the car and talked to him.

"Q. And then came back and sat down? A. And then came back and sat down.

"Q. On which side of the car? A. On the north side.

"Q. Then what happened? A. He rang his gong and started.

"Q. Did you hear him ring the gong? A. Yes, sir, I did. He started his car and she got up and stepped off.

Cramer v. Traction Co.

"Q. She got up from her seat? A. Yes, sir, after he started the car.

"Q. And she went to the rear and stepped off the car? A. Yes, sir.

"Q. Was the car in motion when she stepped off? A. Yes, sir.

"Q. Did she fall when she stepped off? A. I think she did.

"Q. Did you see her fall? A. I saw her fall.

"Q. About what point did she fall in reference to the buildings here? Do you know where Hulse & Nibler now are? A. It was between 'Our Folks' store and Hulse & Nibler's there, between the two. I couldn't say just exactly the place.

"Q. What happened then? A. I had started my car at the time, and when she fell I stopped my car as quick as I could and went to help pick her up.

"Q. Who assisted you? A. Mr. Stephenson and Mr. Campbell.

"Q. Where did you take her first? A. Took her to the stairway there.

"Q. Then where did you take her? A. While I went to telephone to the office, and they took her into the restaurant."

Stephenson and Campbell both testified that plaintiff got off the car while it was in motion, and both testified that Stephenson, seeing that she was going to step off and fearing she would fall, hallooed to the plaintiff and started to run toward her. These three witnesses and four or five others, called by the defendant, testified that plaintiff fell off the car about sixty-five feet east of Reed's drug store, which was opposite the place where the car was stopped, at the junction of Benton avenue and Commercial street.

At the close of all the evidence, defendant moved the court to instruct that under the law and the evidence the plaintiff was not entitled to recover. The court re-

fused this instruction and of its own motion instructed the jury as follows on behalf of the plaintiff:

"The uncontradicted evidence shows that plaintiff was a passenger on the defendant's car. It was the duty of defendant to use the greatest care to see that she safely alighted from the car and to use every reasonable means in its power to avoid injuring her. If the car was standing still and plaintiff was approaching the rear of said car or about to get off of same, then before starting the car it was the duty of the motorman to observe her conduct and remain still till she had safely reached the ground. And if you find from the evidence that he started the car while she was in the act of alighting therefrom, and that she fell by reason thereof, you will find the issues in favor of the plaintiff and assess her damage at such sum as will reasonably compensate her for her pain and suffering caused by the injury. And if you find that her injuries are permanent you will also allow her a reasonable amount sufficient to compensate her for any future disability or pain she is reasonably liable to sustain."

Under the instructions given, the jury returned a verdict for the plaintiff, assessing her damages at fifteen hundred dollars. Timely motions for new trial and in arrest of judgment were filed which the court overruled, whereupon defendant appealed to this court.

BLAND, P. J. (after stating the facts).—1. Defendant makes the point, that the facts stated in the petition are repugnant and if the word 'willfully' is to be rejected, in passing upon the sufficiency of the petition to support the judgment, then there is no issue of negligence pleaded. A petition alleging both willfulness and negligence as grounds for recovery, in Raming v. Railway, 157 Mo. l. c. 508, 57 S. W. 268, was characterized by Judge SHERWOOD as a *felo de se.* An act cannot be both careless and willful. Negligence is an unintentional act or omission. Willfulness is intentional, an act pur-

posely done, not negligently or carelessly done or left undone, hence, as held by Judge SHERWOOD in the Raming case, evidence to prove negligence would negative willfullness and *vice versa.* But there was no evidence offered on the trial proving or tending to prove willfulness and the case was tried by both parties on the theory that plaintiff's injuries were caused by the negligence of the motorman in starting the car while she was in the act of alighting therefrom, therefore, we must do as the parties did on the trial, ignore the charge of willfulness, treat it as mere surplusage and look to the petition, with the word "willfully" eliminated, allegations to support the theory of negligence. [Knox County v. Goggin, 105 Mo. 183, 16 S. W. 684.] The rule of practice in such circumstances is thus stated by ROBINSON, J., in Gannon v. Gas Co., 145 Mo. l. c. 511: "It must be borne in mind, that it has likewise been a rule of long practice, and frequently asserted in this court, based upon the plainest principle of propriety and fairness, that a party will not be driven out of court merely from the fact that he or she has alleged more than has been proven, when the unproven allegations are shown to be unnecessary averments to authorize a recovery; nor will plaintiff's action be denied merely because the testimony offered does not support certain averments in his or her petition when it does support other averments which are sufficient to authorize a recovery." The same ruling is announced in Koopman v. Cahoon, 47 Mo. App. 357; Walker Bros. v. Railway, 68 Mo. App. 465, and in numerous other cases to be found in the Missouri reports.

Another salutary rule of practice, applicable here, is that parties are bound by the theory which they adopt on the trial of the case, and when they treat an issue as properly before the court, an objection, that such issue was not within the allegations of the petition, is waived. [Thorp v. Railway, 89 Mo. 650, 2 S. W. 3; Hilz v. Rail-

way, 101 Mo. 36, 13 S. W. 946; Johnson-Brinkman Co. v. Bank, 116 Mo. 1. c. 567, 22 S. W. 813; Barnard State Bank v. Fesler, 89 Mo. App. 216; Stalzer v. Dold Packing Co., 84 Mo. App. 573; Hackett v. Philadelphia Underwriters, 79 Mo. App. 16.] But if the word "willfully" is eliminated from the petition, then there would be left this allegation of negligence: "That as she (plaintiff) was just alighting from said car, the motorman negligently and carelessly turned on the current of electricity, thereby causing said car to jerk instantly and start at a rapid rate of speed. Said jerk so sudden that it caused plaintiff to fall from the step of said car on to the brick pavement, injuring her as follows." This statement is a specific allegation of negligence, provided there are other allegations in the petition showing that it was the motorman's duty to hold the car a sufficient length of time to enable plaintiff to get off, or that the evidence shows he knew or could have known, by the exercise of due diligence, that she was in the act of alighting when he started the car. It is contended by defendant that neither of these facts are alleged or shown by the evidence, and for this reason plaintiff should have been nonsuited. The petition does not allege that plaintiff informed the motorman of her intention to get off the car at the junction nor is there any direct evidence that the motorman was apprised of her intention to leave the car at that point, but the evidence conclusively shows that plaintiff got a transfer from the motorman and that passengers sometimes boarded the Springfield avenue cars at that point; and the motorman testified that passengers got on and off defendant's cars at the junction, and he also testified that before starting his car he looked around the side of the car to see if anyone was getting off or on.

From these facts in evidence, we think it clearly appears that it was the duty of the motorman to exercise due care to see that all passengers disembarking were safely on the street before he started his car, and that

this duty was not discharged by merely waiting a sufficient length of time for a passenger to get off, for plaintiff's relation to defendant was that of a passenger until she was safely off the car and its agents and employees were bound to exercise the utmost care in discharging her from the car. [O'Brien v. St. Louis Transit Co., — Mo. —, 84 S. W. 939; Fillingham v. St. Louis Transit Co., 102 Mo. App. 573, 77 S. W. 314; Lehner v. Railway, — Mo. —, 85 S. W. 110; Richmond Street Railway Co. v. Scott, 86 Va. 902.]

We think from what is stated in the petition in respect to the negligence of the motorman and other facts, the inference is fairly deducible that the motorman knew, or by the exercise of due care could have known, that plaintiff was leaving the car when he turned the power on to move the car forward. We also think that plaintiff's evidence made out a prima facie case and that, notwithstanding the seeming preponderance of the evidence as a whole was on the side of the defendant, the case was one for the jury and that defendant's instruction that plaintiff could not recover was properly denied.

2. The instruction given for plaintiff is attacked as erroneous for the following reasons:

"First. It entirely ignores every constituent element upon which liability of a carrier of passengers is predicated.

"Second. No issue of knowledge on part of defendant's servant is submitted.

"Third. No issue as to whether car stopped a reasonable time is submitted.

"Fourth. The very issue of the case is assumed and the jury virtually told that the mere fact of an accident justified a verdict for plaintiff. Nor was this feature cured by instruction numbered 4.

"Fifth. It was not the duty of the defendant to use the greatest care to see that she was safely alighted, unless defendant knew or had reasonable grounds to believe she intended and was attempting to alight.

"Nor was it the duty of the defendant's motorman to observe her conduct just because the car was standing still and just because she was approaching the rear of the car or about to get off, unless he did in fact observe her action or knew she was about to get off, etc. This knowledge, the basic fact of liability, is entirely omitted in the instruction.

"So it is not the law, that if he started the car while she was in the act of alighting the defendant is responsible. This declaration also ignores entirely the question of knowledge of the motorman."

The instruction declared it to have been the absolute duty of the motorman to observe the plaintiff, to have seen her approaching the rear of the car and to have kept his eye on her until she was safely on the street before starting his car, notwithstanding the fact that he testified he had no knowledge of her intention to get off, and notwithstanding her negligence in failing to give him warning of her intention to get off.

In Yarnell v. Railway, 113 Mo. l. c. 587, Judge Sherwood, speaking of the duty of those in charge of a train of cars conveying passengers, owe to a passenger in getting off or on the cars, said: "The authorities are virtually unanimous in holding that unless knowledge of such a purpose is communicated to the company's servants, that no duty arises to hold the train for a reasonable time in order that such purpose may be accomplished.

"In such cases the duty is dependent upon the knowledge of the carrier, and the negligence upon the non-performance of the ascertained duty; without the presence of these constituent elements, liability, which is but the legitimate result of a known and non-performed legal duty, cannot exist." In this case an instruction given, which was very much like the one given for plaintiff in the case in hand, was condemned. The facts, however, in this case and the Yarnell case are not at all similar. Yarnell, in company with one Wall and his

two daughters, went to the railroad depot in the night-time to put his daughters on the train. Neither Yarnell or Wall intended to become passengers. Yarnell bought tickets for his daughters and when the train arrived, he and Wall accompanied them to the car. Wall took the valises belonging to the ladies, carried them into the car and when he had seen the ladies seated started back to get off the train, which started and moved twenty-five or thirty-five feet before he alighted. After alighting he walked back on the platform and found Yarnell decapitated. Wall had left Yarnell on the depot platform and there was no evidence that he had entered the car and none that the conductor had seen him or knew of his presence. The gravamen charged in the petition was that the train was not stopped a sufficient length of time to allow the passengers to alight, and what is said in the opinion must be construed in light of the fact that Yarnell was not a passenger and the conductor owed him no duty as such.

It is unquestionably the duty of a passenger on a street car, when he desires to get off at a particular place, to give notice of his intention to the person in charge of the car, in the usual and customary way of giving such notice, and if he fails to do so, he has no ground to charge negligence to the person in charge for failing to anticipate his desire and have the car stopped for him to get off; but it seems to us that where a street car stops at a regular stopping place where passengers are in the habit of getting on and off, and this fact is known to the person in charge of the car, the very act of stopping the car at such a place is an invitation to all on board who wish to get off to do so, and that it is the duty of the person in charge to exercise the same care toward one alighting as though he had given warning of his intention to get off the car at such place. The duty of the person in charge, it seems to us, in such circumstances, is analogous to the duty of the conductor on a steam railroad where his train stops at a regular sta-

tion for the discharge and reception of passengers, that is, he is required to hold his car a reasonable and sufficient time to allow all who desire to get off to disembark in safety. [Cullar v. Railway, 84 Mo. App. 340.]

Judge THOMPSON, in volume 3, section 3518, of his work on negligence, states the duty as follows: "At the outset it is to be remembered that the person attempting to alight from the carrier's vehicle is still a passenger until he has accomplished the act of alighting in safety, and that the street car company is a carrier of passengers and owes to the passenger attempting to alight that very high degree of care and attention which the law puts on it generally, to the end of promoting the safety of the passengers." This paragraph is approvingly quoted by our Supreme Court in O'Brien v. Transit Company, supra.

Whether or not the motorman exercised this high degree of care toward the plaintiff, we think, in the circumstances of the case, was a question of fact for the jury. The instruction given practically took this question from the jury and declared as a matter of law that it was the duty of the motorman to have seen and observed the plaintiff until she reached the street in safety before starting the car. It was not his duty, under the circumstances, to especially observe the plaintiff, for she had not communicated to him her intention to get off, but to watch the rear platform where passengers were accustomed to get on and off and see that no one was in the act of getting on or off before starting his car. The motorman testified that he did look around his car, that he saw no one getting on or off and then sounded his gong and started the car. Whether or not he was negligent in the performance of his duty, we think should have been submitted to the jury.

There was no conductor on the car to look after passengers, and the failure to provide one is not alleged as a negligent omission of duty on the part of the defend-

ant. The motorman was required to do double service. His station was on the front platform of the car where he was bound to remain for the purpose of using and controlling the appliances for the operation and control of the car, and if, from his station, he made the best observation possible to see that no one was getting on or off the car, then sounded the gong as notice of his intention to start, we can see no room to declare as a matter of law that he was negligent in failing to see the plaintiff in the act of getting off.

3. A number of instructions asked by the defendant were refused but we do not deem it necessary to take them up for discussion. What we have said we think, will sufficiently indicate to counsel and the trial court our views of the law of the case to enable them to avoid error in instructing the jury on a retrial of the cause.

For error in the instructions given for plaintiff, the judgment is reversed and the cause remanded. All concur.